IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                               No. CR 16-3308 JB

GASPAR LEAL,

        Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Gaspar Leal's Motion to Dismiss Count 1 -- Conspiracy for Violation of Double Jeopardy Clause, filed March 6, 2018 (Doc. 119) ("Motion"). The primary issues are: (i) whether Defendant Gaspar Leal's Double Jeopardy challenge under the Fifth Amendment of the Constitution of the United States of America to his conspiracy charge in Count I of the Superseding Indictment at 1, filed December 20, 2017 (Doc. 95)("Superseding 3308 Indictment"), is ripe for the Court's pretrial consideration; (ii) whether, if Leal's claim is ripe, the conspiracy for which Leal was previously convicted, in United States v. Leal, No. CR 16-3069 JB (D.N.M.), is the same conspiracy for which Plaintiff United States of America now charges Leal in Count 1; and (iii) whether, if the Court dismisses the Superseding 3308 Indictment's Count 1 for violating the Double Jeopardy Clause, the Court must dismiss the Superseding 3308 Indictment's other Counts without prejudice so that the United States can present the Grand Jury with evidence that does not relate to Leal's conspiracy conviction. The Court concludes: (i) the Motion is ripe, because the Double Jeopardy Clause guarantees the right to not stand trial for an offense for which a defendant has already been convicted; (ii) the Superseding 3308 Indictment does not charge Leal with a conspiracy for

which he has already been convicted, because the Superseding 3308 Indictment and the <u>United States v. Leal</u>, No. CR 16-3069 JB (D.N.M.)'s indictment charge conspiracies with different sets of co-conspirators whose actions are not interdependent; and (iii) even if the Court dismisses Count 1 for violating the Double Jeopardy Clause, it would not dismiss the Superseding 3308 Indictment's remaining Counts without prejudice, because Leal has not shown that presenting the Grand Jury with Count 1 evidence is sufficient reason to dismiss the entire Superseding 3308 Indictment. Accordingly, the Court denies the Motion.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. <u>See</u> Fed. R. Crim. P. 12(d)("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order -- based on the parties' pleadings, the indictments, and other records[1] -- shall serve as the

---

[1]Many of the following findings relating to the charges in this case -- <u>United States v. Leal</u>, No. CR 16-3308 -- come from the United States' pleadings, namely the United States' Response to Defendant's Motion to Dismiss Count 1 of the Superseding Indictment, filed March 20, 2018 (Doc. 121)("Response"); the Government's Notice of Intent to Offer Extra-Judicial Statements, Request for a *James* Hearing, and Opposed Motion *In Limine* to Admit Other Acts Evidence Which are Admissible Under Federal Rules of Evidence 404, 403, and Which are Res Gestae Evidence, filed January 3, 2018 (Doc. 104)("Motion In Limine"); and the United States' Exhibit List, filed January 5, 208 (Doc. 105). In other words, the Court's findings based on those pleadings do not relate to facts in the record, but to the United States' assertions of what the record will show, and indeed what facts the United States expressly seeks to admit in its Motion In Limine. Leal does not challenge the United States' facts and has withdrawn a request for an evidentiary hearing, so his Double Jeopardy theory apparently does not depend on Leal disproving any of the United States' anticipated evidence.

As the Court concludes, <u>infra</u> § I, at 22, Leal's Motion is ripe at this pretrial stage, and so the Court works with what it has at the moment. The Court also concludes, <u>infra</u> § II, at 25, that, based on the record and what the United States intends to prove at trial, the United States charges Leal with a different conspiracy than the one for which he was previously convicted. Although the Court denies the Motion, Leal may have another shot at his Double Jeopardy

Court's essential findings for rule 12(d) purposes.

1.      In the spring of 2016, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") used a confidential informant ("CI") to find people in Albuquerque, New Mexico, with whom to make drug deals.  See United States v. Gaspar Leal, CR No. 16-3069 Trial Transcript at 63:22-24 (taken May 4, 2017)(Bowles, Gettler), filed January 17, 2018 (Doc. 192)("Day 1 Tr.").

2.      Sometime before May 5, 2016, Leal gave an undercover ATF agent a flyer for Leal's haircut business, and the ATF agent gave the CI Leal's telephone number and told him to call him.  See Day 1 Tr. at 32:16-19 (Gettler); United States v. Gaspar Leal, CR No. 16-3069 Trial Transcript at 107:18-25 (taken May 5, 2017)(CI), filed January 17, 2018 (Doc. 193)("Day 2 Tr.").

3.      The CI first spoke with Leal on May 5, 2016, over the telephone.  See Day 2 Tr. at 107:5-9 (Hurtado, CI).

4.      The CI called Leal and made an appointment for a haircut at Leal's house.  See Day 1 Tr. at 44:19-45:2 (Hurtado, Gettler); Day 2 Tr. at 108:16-109:2 (Hurtado, CI).

5.      The CI went to Leal's home on May 7, 2016, and told Leal that he was in Albuquerque to make money buying and selling narcotics.  See Dec. Tr. at 109:19-21 (CI).  The CI told Leal that he was interested in buying "an ounce or two" of methamphetamine or cocaine. Day 2 Tr. at 118:13-21 (Hurtado, CI).

6.      On May 9, 2016, Leal called the CI and said that Leal had a friend named Pete who could sell methamphetamine to the CI.  See Day 1 Tr. at 50:6-16 (Hurtado, Gettler); Day 2 Tr. at 122:23-123:2 (Hurtado, CI).

---

theory down the road if, for example, the trial brings to light new facts indicating that the two conspiracies are one in the same.

7.      Leal gave Pete the CI's phone number, and Pete called the CI to arrange a deal. See Day 2 Tr. at 126:126:4-11 (Hurtado, CI).

8.      The CI met Pete on May 10, 2016, hoping to purchase an ounce or two of methamphetamine, but Pete did not have that much methamphetamine and could sell the CI only 3.5 grams.  See Day 2 Tr. at 126:19-127:5 (Hurtado, CI).

9.      On May 12, 2016, the CI told Leal that he was disappointed in the amount of methamphetamine Pete sold him, and Leal agreed to sell the CI some of his -- Leal's -- drugs. See Day 2 Tr. at 141:18-24 (Hurtado, CI).

10.     The CI went to Leal's apartment, where Leal sold the CI $40.00 worth of heroin and $30.00 worth of methamphetamine.  See Day 2 Tr. at 149:8-20 (Hurtado, CI).

11.     Leal also tried to call other drug dealers to arrange a bigger deal for the CI, but was unsuccessful.  See Day 1 Tr. 105:23-24:10 (Hurtado, Gettler).

12.     On June 8, 2016, Leal was incarcerated, and he called the CI from jail.  See Day 2 Tr. at 155:13-16 (Hurtado, CI).

13.     Leal gave the CI a telephone number for Bernadette Tapia, who, Leal indicated through coded language, could sell the CI drugs.  See Day 2 Tr. at 155:21-156:1 (Hurtado, CI).

14.     B. Tapia's husband, Christopher Apodaca, was in jail with Leal and gave Leal B. Tapia's telephone number.  See Day 2 Tr. at 63:3-10 (Bowles, Gettler).

15.     Apodaca had given B. Tapia the green light to sell drugs to the CI.  See Day 2 Tr. at 181:4-9 (Bowles, CI).

16.     The CI believed that Leal contacted B. Tapia and vouched for the CI, because, when he spoke to B. Tapia, she knew who he was.  See Day 2 Tr. at 162:2-16.

17.     Late on June 8, 2016, the CI and an undercover ATF agent met with B. Tapia and

her daughter, Candace Tapia, and ultimately purchased two ounces of methamphetamine.  See Day 2 Tr. at 14:14-23:17 (Hurtado, Gettler); id. at 28:23-32:2 (Hurtado, Gettler).

18.     For arranging the deal, Leal expected $60.00 to be deposited into his commissary account, which the ATF did on June 9, 2016.  See Day 2 Tr. at 98:8-19 (Dimas, Hurtado).

19.     Leal also expected to receive a third of an ounce of methamphetamine in compensation for arranging the deal, see Day 2 Tr. at 18:2-6 (Hurtado, Gettler), but the record does not reveal whether he ever received that methamphetamine.

20.     On July 12, 2016, a Grand Jury returned an Indictment with two counts against Leal relating to the methamphetamine transaction with B. Tapia and C. Tapia.  See United States v. Leal, CR. No. 16-3069, Indictment at 1, filed July 12, 2016 (Doc. 2)("3069 Indictment").

21.     The 3069 Indictment's Count I charges Leal and co-Defendants Bernadette. Tapia, Brandon Candelaria, and Candace Tapia with conspiracy, contrary to 21 U.S.C. § 846, to distribute 50 grams and more of methamphetamine, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  See 3069 Indictment at 1.

22.     The 3069 Indictment's Count II charges Leal, B. Tapia, Candelaria, and C. Tapia with distributing 50 grams and more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B), and 18 U.S.C. § 2.  See 3069 Indictment at 1.

23.     According to the 3069 Indictment, Leal conspired to distribute and distributed methamphetamine on or about June 8, 2016.  See 3069 Indictment at 1; id. at 2.

24.     In July, 2016, Leal was incarcerated at the Central New Mexico Correctional Facility.  See United States' Response to Defendant's Motion to Dismiss Count 1 of the Superseding Indictment at 4, filed March 20, 2018 (Doc. 121)("Response").

25.     On July 21, 2016, Leal called the CI from prison and told the CI to contact a man

named Jose Casillas.  See Response at 4; Government's Notice of Intent to Offer Extra-Judicial Statements, Request for a *James* Hearing, and Opposed Motion *In Limine* to Admit Other Acts Evidence Which are Admissible Under Federal Rules of Evidence 404, 403, and Which are Res Gestae Evidence at 15, filed January 3, 2018 (Doc. 104)("Motion In Limine"); United States' Exhibits List at 1 (indicating that it intends to introduce as evidence a July 21, 2016 telephone call between the CI and Leal).

26.     Leal gave the CI Casillas' telephone number.  See Response at 4; Motion In Limine at 15.

27.     The CI called Casillas and indicated that he wanted to buy methamphetamine. See Response at 4; Motion In Limine at 15-16; United States' Exhibits List at 1 (indicating that it intends to introduce evidence of a July 21, 2016 telephone call between the CI and Casillas).

28.     Casillas told the CI that he would check with an unidentified woman on methamphetamine prices and would connect the woman with the CI.  See Response at 4; Motion In Limine at 15-16.

29.     On July 22, 2016, a woman named Erika Barraza texted the CI.  See Response at 4; Motion In Limine at 16.

30.     On July 24, 2016, the CI called Barraza, and Barraza told the CI that her boyfriend, Luis Arreola-Palma, was in prison with Leal and that Arreola-Palma instructed her to contact the CI. See Response at 4; Motion In Limine at 16.

31.     Later on July 24, 2016, Casillas initiated a three-way telephone call to the CI.  See Response at 4; Motion In Limine at 16; United States' Exhibits List at 1 (indicating it intends to introduce evidence of a July 24, 2016 telephone call between the CI, Leal, and Arreola-Palma).

32.     Leal told the CI that he had been having trouble reaching the CI.  See Response at

4; Motion In Limine at 16.

33.     Leal turned the telephone over to Arreola-Palma.  <u>See</u> Response at 4; Motion In Limine at 16.

34.     Arreola-Palma told the CI to contact his cousin, Daniel Carmona, because Carmona could sell the CI an ounce of methamphetamine.  <u>See</u> Response at 4; Motion In Limine at 16-17.

35.     Arreola-Palma told the CI to tell Carmona that Arreola-Palma suggested that the CI call him.[2]  <u>See</u> Response at 4.

36.     Arreola-Palma said that Carmona's price for an ounce is $300.00 for the first transaction and $400.00 for an ounce in any future transactions.  <u>See</u> Response at 4-5; Motion in Limine at 16-17.

37.     The CI said that he liked those prices and would be willing to compensate Arreola-Palma for brokering the deal.  <u>See</u> Response at 5; Motion In Limine at 17.

38.     Arreola-Palma replied that he was helping broker the deal as a favor to Leal.  <u>See</u> Response at 5; Motion In Limine at 17.

39.     Arreola-Palma returned the telephone to Leal, and Leal gave the CI Carmona's telephone number.  <u>See</u> Response at 5; Motion In Limine at 17.

---

[2]The United States' Proposed Opening Statement PowerPoint Presentation in No. CR 16-3308 asserts that Leal and Arreola-Palma called the CI on June 24, 2016, to tell him to contact Carmona about buying methamphetamine.  <u>See</u> Proposed 3308 Opening PowerPoint at 6, filed March 6, 2018 (Doc. 119-1).  The Court concludes that the Proposed Opening PowerPoint's June 24, 2016, date is a typographical error, because the United States, in the Response and its Motion In Limine, consistently refers to the Leal/Arreola-Palma/Carmona deal as happening in July, 2016, and the 3069 Indictment charges that Leal, Arreola-Palma, and Carmona entered into a methamphetamine distribution conspiracy that began "on or about July 21, 2016," and concluded "on or about July 25, 2016."  3069 Indictment at 1.

40.     Leal asked the CI to send him some money.  See Response at 5; Motion In Limine at 17.

41.     Later that day, the CI spoke with Carmona on the telephone, and they discussed conducting a methamphetamine transaction the next day.  See Response at 5; Motion In Limine at 18.

42.     In subsequent text messages, Carmona informed the CI that the price for an ounce of methamphetamine would be $550.00.  See Response at 5-6; Motion In Limine at 19.

43.     On July 25, 2016,[3] the CI and an undercover ATF agent met Carmona in a Walmart parking lot where they purchased over 50 grams of methamphetamine.  See Response at 6; Motion In Limine at 19-21.

44.     On August 3, 2016, the CI and the undercover ATF agent again purchased over 50 grams of methamphetamine from Carmona.  See Response at 6; Motion In Limine at 21.

45.     On August 9, 2016, a Grand Jury returned the indictment for No. CR 16-3308, charging Leal, Carmona, and Arreola-Palma with conspiracy, contrary to 21 U.S.C. § 846, and to distribute 50 grams and more of methamphetamine, contrary to 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  See Indictment at 1, filed August 9, 2016 (Doc. 2)("3308 Indictment").

46.     According to the 3308 Indictment, Leal's conspiracy began "on a date unknown, but not later than on or about July 21, 2016, and continuing through on or about July 25, 2016." 3308 Indictment at 1.

47.     The Grand Jury returned a superseding indictment in this case, superseding the 3308 Indictment.  See Superseding 3308 Indictment at 1.  The Superseding 3308 Indictment

---

[3]Again, the Proposed 3308 Opening PowerPoint identifies this meeting as happening on June 25, 2016, but the Court concludes, for the same reasons identified supra n.2, that the June 25 date is a typographical error.

charges Leal with three counts.  <u>See</u> Superseding 3308 Indictment at 1.  Count I charges Leal with a conspiracy that began "on a date unknown, but not later than July 21, 2016, and continuing to on or about August 3, 2016," to distribute 50 grams and more of methamphetamine.  Superseding 3308 Indictment at 1.  Count II charges Leal with distributing 50 grams and more of methamphetamine "[o]n or about July 25, 2016."  Superseding 3308 Indictment at 1.  Count III charges Leal with distributing 50 grams and more of methamphetamine "[o]n or about August 3, 2016."  Superseding 3308 Indictment at 2.

48.    In December, 2017, the Court held a trial for Leal on the 3069 Indictment's Counts I and II.  <u>See</u> No. CR 16-3069 Clerk's Minutes, filed December 4, 2017 (Doc. 202).  On December 6, 2017, the petit jury found Leal guilty of conspiracy to distribute 50 grams and more of methamphetamine, and not guilty of distributing 50 grams and more of methamphetamine. <u>See</u> Verdict at 1, filed December 6, 2017 (Doc. 201).

49.    The United States' Proposed 3308 Opening PowerPoint includes assertions about Leal's actions taken before July 21, 2016 -- the approximate date upon which the Superseding Indictment charges that Leal entered the conspiracy now at issue -- and pursuant to the conspiracy for which Leal was convicted at his December, 2017 trial.  <u>See</u> Proposed Opening PowerPoint at 1-5.

50.    Specifically, the Proposed 3308 Opening PowerPoint states that (i) Leal first contacted the CI on May 5, 2016, <u>see</u> Proposed 3308 Opening PowerPoint at 1; (ii) the CI first went to Leal's apartment on May 7, 2016, and "observe[d] Leal in possession of crack cocaine, powder cocaine, heroin, and methamphetamine," Proposed 3308 Opening PowerPoint at 2; (iii) Leal, on May 10, 2016, arranged for the CI to buy methamphetamine from a drug dealer named Pete, <u>see</u> Proposed 3308 Opening PowerPoint at 3; (iv) Leal sold the CI heroin and

methamphetamine on May 12, 2016, see Proposed 3308 Opening PowerPoint at 4; (v) Leal called the CI on June 8, 2016, and told him to call B. Tapia to purchase methamphetamine, see Proposed 3308 Opening PowerPoint at 5.

**PROCEDURAL BACKGROUND**

The Superseding 3308 Indictment's Count I charges Leal with a conspiracy that began "on a date unknown, but not later than July 21, 2016, and continuing to on or about August 3, 2016," to distribute 50 grams and more of methamphetamine. Superseding 3308 Indictment at 1. Count II charges Leal with distributing 50 grams and more of methamphetamine "[o]n or about July 25, 2016." Superseding 3308 Indictment at 1. Count III charges Leal with distributing 50 grams and more of methamphetamine "[o]n or about August 3, 2016." Superseding 3308 Indictment at 2. The trial is set for June 11, 2018. See Order Continuing Trial Setting at 1, filed April 5, 2018 (Doc. 129).

1.    **The Motion**.

In the Motion, Leal asks the Court to dismiss the Superseding Indictment's conspiracy charge. See Motion at 1. According to Leal, the conspiracy charge violates the Double Jeopardy Clause, because Superseding 3308 Indictment's conspiracy charge alleges a time frame that overlaps with the conspiracy charge timeframe for which he was previously convicted. See Motion at 2-3. Leal also asks that the Court dismiss the Superseding 3308 Indictment's other charges without prejudice, so that the United States can make a "fresh presentation of those charges to a new grand jury" that excludes the proof supporting the conspiracy charge. Motion at 3. Leal asserts that the conspiracy charges both refer to the same criminal agreement during the same time frame. See Motion at 7. According to Leal, the United States now "seeks to use the same overlapping proof, utilize the same CI testimony, and elicit much of the same

underlying evidence to convict Mr. Leal" of the Superseding Indictment's conspiracy charge. Motion at 7.  Leal asks the Court for an evidentiary hearing.  See Motion at 7.

>    2.    **The Response.**

The United States asserts three main arguments in its Response.  First, the United States argues that Leal's claim is not ripe, because the trial has not yet happened, and Leal is only speculating about what evidence the United States will bring.  See Response at 7-8.  According to the United States, the appropriate procedure for Leal's Double Jeopardy claims would be as a motion for a judgment of acquittal sometime after the United States presents its case pursuant to rule 29 of the Federal Rules of Criminal Procedure.  See Response at 8.

Second, the United States argues that the charged conspiracies refer to different agreements with different people with different goals.  See Response at 8.  The United States asserts that there are "no overlapping overt acts in support of both conspiracies."  Response at 10.  According to the United States, Leal was convicted of a conspiracy he formed in the summer of 2016 with a CI and two women -- C. Tapia and B. Tapia.  See Response at 2-3.  The United States asserts that Leal, pursuant to this conspiracy, arranged in May, 2016, for the CI to purchase methamphetamine from a drug dealer.  See Response at 3.  The United States also asserts that Leal, while in jail, acted pursuant to this conspiracy again in June, 2016, by arranging for the CI and an ATF undercover agent to purchase methamphetamine from C. Tapia and A. Tapia.  See Response at 3.  As for this trial's conspiracy charge, the United States asserts that, in July, 2016, Leal entered into a different conspiracy to distribute methamphetamine by arranging, from prison -- a different facility than the one in which he was detained the prior month -- a deal where the CI and an undercover ATF agent purchased methamphetamine from Carmona.  See Response at 5-6.

Third, the United States contends that, to the extent it plans to introduce evidence that it introduced at Leal's December, 2017, trial, it plans to do so not as proof of Leal's guilt on his present charges, but instead to show motive, opportunity, intent, preparation, plan, knowledge, identify or absence of mistake or accident pursuant to rule 404(b) of the Federal Rules of Evidence.  <u>See</u> Response at 11.

3.      **<u>The Reply</u>.**

Leal replies to the United States' Response.  <u>See</u> Defendant Gasper Leal's Reply to United States' Response to Motion to Dismiss Count 1 -- Conspiracy for violation of Double Jeopardy Clause, filed April 4, 2018 (Doc. 127)("Reply").  Leal argues that his claim is ripe, because "the whole point of the Double Jeopardy Clause is to prevent a defendant from having to 'run the gamut twice.'"  Reply at 1.  Leal contends that there is "ample evidence and a record before the Court" indicating that the two conspiracies are essentially the same agreement that overlap in time, and that the only distinction is that "there are different overt acts and different 'players' in the two indictments."  Reply at 1.  Specifically, Leal contends that, in both the 3069 Indictment and the Superseding 3308 Indictment, the United States charges that Leal agreed with the same CI to arrange drug transactions.  <u>See</u> Reply at 1-2.  Leal also contends that he is "permitted under settled Tenth Circuit case law" to appeal an adverse pretrial ruling on this matter, "which further supports the idea that a pretrial ruling should be made on the motion."  Reply at 2.  Finally, Leal argues that the United States seeks to avoid Double Jeopardy problems by "labeling evidence of the same prior conspiracy 404(b), as opposed to what it actually is -- evidence of the exact same conspiracy that Mr. Leal is sought to be tried on now."  Reply at 2.

## LAW REGARDING CONSPIRACY

To prove a conspiracy, the government must show:

> (1) that two or more people agreed to violate the law[,] (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent. . . .  A single conspiracy does not exist solely because many individuals deal with a common central player.  What is required is a shared single criminal objective, not just similar or parallel objectives between similarly situated people.  On the other hand, a defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy.  The government need only prove by direct or circumstantial evidence that the defendant knew at least the essential objectives of the conspiracy and the defendant knowingly and voluntarily became part of it.

United States v. Small, 423 F.3d 1164, 1182-83 (10th Cir. 2005)(quoting United States v. Evans, 970 F.2d 663, 668-671 (10th Cir. 1992), and United States v. Mendoza-Solgado, 964 F.2d 993, 1005 (10th Cir. 1992))(internal citations, quotations, and emphasis omitted).  Conspiracy is not a collection of various separate and distinct events, but rather is "the prototypical continuing offense."  United States v. Acosta-Gallardo, 656 F.3d 1109, 1122 (10th Cir. 2011)(quoting United States v. Jaynes, 75 F.3d 1493, 1505 (10th Cir. 1996)).  "'A conspirator is only liable for the acts of co-conspirators until the conspiracy accomplished its goals or that conspirator withdraws.'"  United States v. Thornburgh, 645 F.3d 1197, 1204 (10th Cir. 2011)(quoting United States v. Cherry, 217 F.3d 811, 817 (10th Cir. 2000)).

## LAW REGARDING THE DOUBLE JEOPARDY CLAUSE

The Fifth Amendment guarantees that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  This amendment protects individuals not only from "successive prosecutions, but also [from] successive punishments for the same offense."  United States v. Morris, 247 F.3d 1080, 1083 (10th Cir. 2001)(citing United States v. Dixon, 509 U.S. 688, 696 (1993)).

The Double Jeopardy Clause often comes up in the context of multiplicity -- when a single indictment charges multiple offenses covering the same act or behavior. The United States Court of Appeals for the Tenth Circuit's "jurisprudence establishes that multiplicitous sentences violate the Double Jeopardy Clause." United States v. McCullough, 457 F.3d 1150, 1162 (10th Cir. 2006)(internal quotation marks omitted). "Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior." United States v. McCullough, 457 F.3d at 1162 (quoting United States v. Johnson, 130 F.3d 1420, 1424 (10th Cir. 1997)). "Although multiplicity is not fatal to an indictment, multiplicitous counts which may result in multiplicitous convictions are considered improper because they allow multiple punishments for a single criminal offense." United States v. McCullough, 457 F.3d at 1162 (internal quotation marks omitted).

The issue of multiplicity may arise when, for example, an indictment levies multiple assault charges against a defendant stemming from two episodes concerning a prison guard occurring close in time, see United States v. Segien, 114 F.3d 1014, 1022 (10th Cir. 1997)(discussing multiple 18 U.S.C. § 111 charges), abrogated on other grounds by Jones v. United States, 526 U.S. 227 (1999), or simultaneously mailing to the IRS several different false documents in support of a single tax return, see United States v. Bettenhausen, 499 F.2d 1223, 2134 (10th Cir. 1974). In such situations, the central question is often whether the underlying conduct is part of the same transaction or comprises distinct episodes that can be punished separately. See, e.g., United States v. Neha, No. 04-1677, 2007 WL 7017193, at *2-3 (D.N.M. Feb. 18, 2007)(Browning, J.)(concluding that the offenses charged in four counts constituted separate acts and were not multiplicitous charges for the same offensive conduct, because there was more than one rape, because the defendant was the principal in one rape, and the aider and

abettor in the other, and because the alleged crimes likely did not occur at the same time).

The issue of multiplicity may also arise when the defendant is charged with violations of multiple criminal statutes for the same underlying acts or omissions. See United States v. Patterson, 760 F.Supp.2d 1116, 1120 (D.N.M. 2009)(Browning, J.). When confronting such a situation, courts employ a two-step test: "A person may be prosecuted for more than one crime based on the same conduct (1) if each crime requires proof of a fact that the other does not, or (2) if Congress has clearly expressed its intent to impose cumulative punishment for the same conduct under different statutory provisions." United States v. Pearson, 203 F.3d 1243, 1267-68 (10th Cir. 2000)(citations omitted). When, as is often the case, there is no clearly discernible congressional intent to impose cumulative punishment, courts use the rule of statutory construction described in Blockburger v. United States, 284 U.S. 299 (1932)("Blockburger"). See United States v. Greene, 239 F. App'x 431, 436 (10th Cir. 2007)(unpublished)(citing United States v. Morehead, 959 F.2d 1489, 1506 (10th Cir.1992), aff'd on reh'g en banc sub nom. United States v. Hill, 971 F.2d 1461 (10th Cir. 1992)).

The Blockburger rule is often known as the "same elements test." United States v. Pearson, 203 F.3d at 1268. "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." Blockburger, 284 U.S. at 304. "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." Blockburger, 284 U.S. at 304 (internal quotation marks omitted).

When confronted with a multiplicitous indictment, a trial court has the discretion to dismiss the multiplicitous counts or to require the government to elect between the multiplicitous counts before trial, or to vacate one of the multiplicitous convictions after trial. See United States v. Johnson, 130 F.3d at 1426 (citing United States v. Throneburg, 921 F.2d 654, 657 (6th Cir. 1990)). If the trial court allows multiplicitous charges to go to the jury, however, the options are more limited: "Where multiplicitous convictions are found, 'the only remedy . . . is . . . to vacate one of the underlying convictions as well as the . . . sentence based upon it.'" United States v. Barrett, 496 F.3d 1079, 1095 (10th Cir. 2007)(alterations in original)(quoting Rutledge v. United States, 517 U.S. 292, 301-02 (1996)). The risk inherent in a failure to dispose of multiplicitous charges before trial is that it "may falsely suggest to a jury that a defendant has committed not one but several crimes." United States v. Johnson, 130 F.3d at 1426 (internal quotation marks omitted). "Once such a message is conveyed to the jury, the risk increases that the jury will be diverted from a careful analysis of the conduct at issue, and will reach a compromise verdict or assume the defendant is guilty on at least some of the charges." United States v. Johnson, 130 F.3d at 1426 (internal quotation marks omitted).

The Double Jeopardy Clause also applies to successive punishments or successive prosecutions for the same offense. See United States v. Mintz, 16 F.3d 1101, 1104 (10th Cir. 1994). Thus, an indictment may violate the Double Jeopardy Clause if it charges a defendant with a crime for which the defendant has already been convicted or acquitted. See, e.g., United States v. Mintz, 16 F.3d 1101, 1106 (10th Cir. 1994)("Since Defendants were indicted for the same conspiracy in Florida and this charge was dismissed with prejudice, to subject Defendants to a trial on the same charge in Kansas would violate the Double Jeopardy Clause of the Constitution.").

As the Supreme Court of the United States has noted, in the related context of determining when a jury instruction for a lesser-included offense may be given, an elements test is "certain and predictable," because "the elements approach involves a textual comparison of criminal statutes and does not depend on inferences that may be drawn from evidence introduced at trial." Schmuck v. United States, 489 U.S. 705, 720 (1989). See United States v. Greene, 239 F.App'x at 436 (discussing Schmuck v. United States in context of the Blockburger v. United States test). The Supreme Court has clarified, however, that the Blockburger v. United States test applies only to charges or convictions asserting violations of separate statutes, and not to separate subsections of the same criminal provision. See Sanabria v. United States, 437 U.S. 54, 70 n.24 (1978)(noting that the Blockburger v. United States test is used "to determine whether a single transaction may give rise to separate prosecutions, convictions, and/or punishments under separate statutes").[4]

---

[4]It may also be the case that a Congressional intent not to allow prosecution for the same transaction under different statutes will trump the elements test. In Ball v. United States, 470 U.S. 856 (1985), the Supreme Court held that a defendant could not be convicted under both then-18 U.S.C. § 922(h) -- prohibiting felons from receiving firearms -- and then-18 U.S.C. § 1202(a) -- prohibiting felons from possessing firearms -- for the same firearm. The Supreme Court characterized Blockburger v. United States as indicating an intent against cumulative punishment, because receiving a weapon necessarily involved possessing it, thus making the statutes multiplicitous under Blockburger v. United States. See Ball v. United States, 470 U.S. at 861-62. The Supreme Court buttressed this position with the congressional intent expressed in legislative history, however, and also indicated that the Blockburger v. United States test was a proxy for the will of Congress. See Ball v. United States, 470 U.S. at 861-64. The Blockburger v. United States test thus remains good law, but the decision in Ball v. United States indicates that, if a situation arose where the elements test were satisfied, but there was some other clear expression of Congressional intent not to allow cumulative punishment, then Congressional intent would govern and multiple charges for the same conduct would violate the Fifth Amendment. The Blockburger v. United States test might be better expressed therefore not as presenting two ways in which cumulative punishment may be allowed -- based on different elements or based on Congressional intent -- but as being a two-step process in which a court first tries to discover the intent of Congress on the question, whether that intent is for or against cumulative punishment, and if that fails, then resorting to the elements test.

As an example of the elements test at work, in United States v. Greene, the defendant was charged and convicted for both tax evasion and making a false statement for the same act of filing a form.  See 239 F.App'x at 436.  The Tenth Circuit held that the convictions were not multiplicitous, because tax evasion required proof of a substantial tax deficiency and an intent to evade taxes, neither of which the other charge required, while the false filing count required proof of knowingly signing a false statement under oath, which was not an element of tax evasion.  See United States v. Greene 239 F.App'x at 437-38.  By contrast,  in United States v. Morehead, 959 F.2d 1489 (10th Cir. 1992), the Tenth Circuit found convictions under both 18 U.S.C. § 856(a)(1) and 18 U.S.C. § 856(a)(2) to be multiplicitous.  See 959 F.2d at 1506-08. The 18 U.S.C. § 856(a)(2) charge required proof that the defendant knowingly maintained a house for marijuana trafficking, while the 18 U.S.C. § 856(a)(2) charge required proof that the defendant knowingly managed or controlled a house, and rented, leased, or made it available for drug trafficking.  See United States v. Morehead, 959 F.2d at 1507.  The Tenth Circuit held that managing  or  controlling,  and  maintaining,  were  the  same,  and  that,  thus,  the  18  U.S.C. § 856(a)(2) charge had an additional element -- renting or leasing -- that was not in 18 U.S.C. § 856(a)(1), but that 856(a)(1) did not contain any element that was not part of 18 U.S.C. § 856(a)(2).  Accordingly, the counts were multiplicitous.  See United States v. Morehead, 959 F.2d at 1507.

## LAW REGARDING MOTIONS TO DISMISS IN CRIMINAL CASES

The Federal Rules of Criminal Procedure contain no analog for summary judgment under rule 56 of the Federal Rules of Civil Procedure.  See United States v. China Star, Inc., 375 F. Supp. 2d 1291, 1293 (D.N.M. 2005)(Browning, J.)("Under Tenth Circuit law, the Court is not free to determine, like on a motion for summary judgment under the Federal Rules of Civil

Procedure, whether a genuine issue of material fact exists."). "Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion." United States v. Hall, 20 F.3d at 1087. When testing an indictment's sufficiency before trial, an indictment's allegations are taken as true, and courts should not consider evidence outside of the indictment. See United States v. Hall, 20 F.3d at 1087. See also United States v. Tafoya, 376 F. Supp. 2d 1257, 1260 (D.N.M. 2005)(Browning, J.). Accordingly an indictment is legally sufficient so long as it:

> (1) contains the essential elements of the offense intended to be charged, (2) sufficiently apprises the accused of what he must be prepared to defend against, and (3) enables the accused to plead an acquittal or conviction under the indictment as a bar to any subsequent prosecution for the same offense.

United States v. Hall, 20 F.3d at 1087. The Tenth Circuit has, however, carved out an exception to that general rule for cases "where the underlying facts [are] essentially undisputed and the government fail[s] to object to the district court's resort to evidence beyond the four corners of the indictment." United States v. Hall, 20 F.3d at 1087. "Under this scenario, a pretrial dismissal is essentially a determination that, *as a matter of law,* the government is incapable of proving its case beyond a reasonable doubt." United States v. Hall, 20 F.3d at 1088 (emphasis in original).

The Federal Rules of Criminal Procedure permit defendants, however, to assert defects other than evidentiary insufficiency before trial, because rule 12(b) allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). See Fed. R. Crim. P. 12(b)(1) advisory committee note to 2014 amendments ("The more modern phrase 'trial on the merits' is substituted for the more archaic phrase 'trial of the general issue.' No change of meaning is intended."). That "Rule 47 applies to a pretrial motion," Fed R. Crim. P. 12(b)(1), means that the Court may consider

evidence outside of the indictment, see Fed. R. Crim. P. 47(d) ("The moving party must serve

any supporting affidavit with the motion. A responding party must serve any opposing affidavit

at least one day before the hearing, unless the court permits later service."). On the other hand,

rule 47(d) does not permit courts to conduct a "trial on the merits," Fed. R. Crim. P. 12(b)(1), via

motion practice, because

> [t]he last sentence providing that a motion may be supported by affidavit is not
> intended to permit 'speaking motions' (e.g. motion to dismiss an indictment for
> insufficiency supported by affidavits), but to authorize the use of affidavits when
> affidavits are appropriate to establish a fact (e.g. authority to take a deposition or
> former jeopardy).

Fed R. Crim. P. 47 advisory committee's note to 1944 adoption.

A court can determine a pretrial motion without a trial on the merits when a motion goes

to "what evidence might be admitted at trial . . . or the conduct of and preparation for trial."

United States v. Pope, 613 F.3d 1255, 1260 (10th Cir. 2010)(Gorsuch, J.). Pretrial motions that

"seek and result in dismissal of the case altogether but that can be decided, at least in the

circumstances of the case at hand, without deciding any disputed questions of fact about the

circumstances of the alleged crime" -- i.e., motions that "involve only the taking of evidence that

is 'entirely segregable from the evidence to be presented at trial'" -- also qualify under rule

12(b)(1). United States v. Pope, 613 F.3d at 1260 (quoting United States v. Barletta, 644 F.2d

50, 58 (1st Cir. 1981)). See United States v. Olivas-Perea, No. CR 16-4518, 2017 WL 5001985

(D.N.M. October 31, 2017)(Browning, J.)("To decide the MTD, the Court needs to determine

only when, not whether, Olivas-Perea was found in the United States, so the Court faces a factual

dispute that is peculiar to the MTD, and does not go to Olivas-Perea's guilt or innocence.").

Similarly, courts "may entertain motions that require it to answer only pure questions of law."

United States v. Pope, 613 F.3d at 1260.

The "most prominent" reason for that rule is "respect for the role of the jury." United States v. Pope, 613 F.3d at 1259.[5] The jury is charged with determining a defendant's guilt or innocence, so fact-finding "based on evidence that goes to this question can risk trespassing on territory reserved to the jury." United States v. Pope, 613 F.3d at 1259. Criminal defendants are entitled to "'a jury determination that [they are] guilty of every element of the crime with which [they are] charged, beyond a reasonable doubt.'" Apprendi v. New Jersey, 530 U.S. 466, 477 (2000)(quoting United States v. Gaudin, 515 U.S. 506, 510 (1995)). That entitlement extends to so-called "sentencing factors," i.e., facts, "[o]ther than the fact of a prior conviction," that increase "the penalty for a crime beyond the prescribed statutory maximum." Apprendi v. New Jersey, 530 U.S. at 490.

## ANALYSIS

The Court first concludes that the Motion is ripe, because the Double Jeopardy Clause guarantees the right to not stand trial for an offense for which a defendant has already been convicted. Second, the Court concludes that the Superseding 3308 Indictment charges Leal with a conspiracy that is different from the conspiracy for which Leal was already convicted, because they involve different sets of co-conspirators whose actions are not interdependent. Third, the Court concludes that, even if the Court dismissed Count 1 for violating the Double Jeopardy Clause, it would not dismiss the Superseding 3308 Indictment's remaining Counts, because Leal has not shown that presenting the Grand Jury with evidence relating to an offense for which the

---

[5]Other reasons for the rule include: (i) that evidence adduced at trial can provide a more certain framework for a court's analysis; (ii) that holding a separate mini-trial on a defense "only to repeat the exercise with largely the same evidence a short time later at the trial itself" disserves judicial economy; and (iii) that permitting pre-trial motions on matters to be presented at trial could "facilitate an end-run around the limited discovery rules governing criminal proceedings." United States v. Pope, 613 F.3d at 1259.

Double Jeopardy Clause bars prosecution justifies dismissing the entire indictment and not just the counts charging such offenses.  Accordingly, the Court denies the Motion.

I.      **THE COURT CAN DECIDE THE MOTION BEFORE TRIAL, BECAUSE THE MOTION IS RIPE.**

The Double Jeopardy Clause provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb," U.S. Const. amend. V.  Caselaw establishes that a defendant need not wait until after a trial's conclusion before asserting his or her Double Jeopardy rights and may immediately seek appeal on a court's pretrial denial of that right.  See Abney v. United States, 431 U.S. 651, 660-61 (1977).  The Supreme Court has explained that:

> the rights conferred on a criminal accused by the Double Jeopardy Clause would be significantly undermined if appellate review of double jeopardy claims were postponed until after conviction and sentence.  To be sure, the Double Jeopardy Clause protects an individual against being twice convicted for the same crime, and that aspect of the right can be fully vindicated on an appeal following final judgment, as the Government suggests.  However, this Court has long recognized that the Double Jeopardy Clause protects an individual against more than being subjected to double punishments.  It is a guarantee against being twice put to trial for the same offense.

Abney v. United States, 431 U.S. at 660-61.  See United States v. Rodriguez-Aguirre, 73 F.3d at 1023 (hearing a defendant's pretrial appeal of the district court's denial of his motion to dismiss charges on Double Jeopardy grounds).

The United States asserts that Leal does not have a right to a pretrial Double Jeopardy challenge, because Leal was not acquitted in his previous trial.  See Response at 7.  The United States notes that barring a retrial after an acquittal is meant to prevent the state from making multiple attempts at convicting someone for a particular charge, which would subject the person "'to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety, and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.'"  Response at 7 (quoting United States v. Wood, 958 F.2d 963, 971 (10th Cir.

1992)).  The United States argues that, because Leal does not face the risk that an acquittal will turn into a guilty verdict, the justification for a pretrial Double Jeopardy challenge does not apply.  See Response at 7.  The United States acknowledges that multiple punishments for one crime implicates the Double Jeopardy clause, and suggests that Leal should wait to see whether he is convicted, and, if so, raise his Double Jeopardy concerns in a motion pursuant to rule 29 of the Federal Rules of Criminal Procedure.  See Response at 8.

The Court recognizes that a second prosecution on the same crime instills different anxiety in a defendant already convicted for that crime than the anxiety instilled in one who was acquitted.  The Double Jeopardy Clause protects them both, however, from that second prosecution.  The Supreme Court has explained:

> Our cases have recognized three separate guarantees embodied in the Double Jeopardy Clause: It protects against a second prosecution for the same offense after acquittal, **against a second prosecution for the same offense after conviction**, and against multiple punishments for the same offense. Illinois v. Vitale, 447 U.S. 410, 415 . . . (1980).  The primary goal of barring reprosecution after acquittal is to prevent the State from mounting successive prosecutions and thereby wearing down the defendant. . . .  The primary purpose of foreclosing a second prosecution after conviction, on the other hand, is to prevent a defendant from being subjected to multiple punishments for the same offense.

Justices of Boston Mun. Court v. Lydon, 466 U.S. 294, 306-07 (1984)(emphasis added).  See North Carolina v. Pearce, 395 U.S. 711, 717 (U.S. 1969)(listing the same three guarantees), overruled on other grounds by Alabama v. Smith, 490 U.S. 794 (1989)); Ex parte Nielsen, 131 U.S. 176, 185 (1889).[6]  Protecting against multiple punishments is not the entire story, however,

---

[6]Ex parte Nielsen is one of the earliest Supreme Court cases concluding that the Double Jeopardy Clause proscribes prosecuting an offense -- not simply issuing further punishment -- when the defendant has already been convicted for that offense.  In Ex parte Nielsen, prosecutors in the then-territory of Utah charged the defendant, Hans Nielsen, in two separate indictments, with "cohabitating with more than one woman" -- a misdemeanor punishable by a $300.00 fine and/or six months imprisonment -- and committing adultery -- a

because "the guarantee against double jeopardy assures an individual that, among other things, he will not be forced, with certain exceptions, to endure the personal strain, public embarrassment, and expense of a criminal trial more than once for the same offense." Abney v. United States, 431 U.S. at 661. The Double Jeopardy Clause "thus protects interests wholly unrelated to the propriety of any subsequent conviction," so the Court will not force Leal to wait for a verdict before determining whether the United States can prosecute Leal.

The United States also argues that the Motion is not yet ripe, because Leal does not yet know what evidence the United States will introduce. See Response at 7-8. The Court need not wait to see the United States' trial evidence to determine whether Count 1 of the Superseding 3308 Indictment charges a conspiracy for which Leal has already been convicted. Whether they are the same conspiracy does not depend on what evidence is used to prove it. To determine whether the conspiracies are one in the same, the Court will look to "'whether the alleged co-conspirators were united in a common unlawful goal or purpose.'" United States v. Sasser, 974

---

felony punishable by no more than three years imprisonment. 131 U.S. at 177. One indictment charged that H. Nielsen lived with Anna Nielsen -- his wife -- and Caroline Nielsen -- not his wife -- between October 15, 1885 to May 13, 1888. See 131 U.S. at 177. The other indictment charged that H. Nielsen committed adultery with C. Nielsen on May 14, 1888. See 131 U.S. at 177. It appears that H. Nielsen pleaded guilty to cohabitation, and then immediately pleaded not guilty to adultery, arguing that "he had already been convicted of the offense charged in this indictment by his plea of guilty to the other." 131 U.S. at 177. His theory was that, although the indictment charged that H. Nielsen's unlawful cohabitation ended on May 13, 1888, it in fact continued well past that date and indeed "embraced the time within which the crime of adultery was charged to have been committed." 131 U.S. at 177-78. Thus, according to H. Nielsen, "the offense charged in both indictments was one and the same offense and not divisible." 131 U.S. at 178. The territory of Utah did not see it H. Nielsen's way, and, after H. Nielsen served his three months and paid his $100.00 fine for unlawful cohabitation, H. Nielsen was tried and convicted of adultery. See 131 U.S. at 178. On appeal, H. Nielsen found a receptive jurist in Justice Joseph P. Bradley, Associate Justice of the Supreme Court of the United States, who agreed with H. Nielsen's position, and concluded that, in light of H. Nielsen's cohabitation guilty plea and Double Jeopardy principles, the territory of Utah "ha[d] no authority to render judgment against the defendant." 131 U.S. at 183-84.

F.2d 1544, 1550 (10th Cir. 1992)(quoting United States v. Daily, 921 F.2d 994, 1007 (10th Cir. 1990)).  To help it decide the question, the Court has the 3069 Indictment, the 3308 Indictment, the Superseding 3308 Indictment, Leal's December, 2017, trial records, and the facts that the parties allege in their pleadings on this Motion.  See United States v. Sasser, 974 F.2d at 1550 (determining whether a defendant joined one or two conspiracies by reviewing indictments and trial transcripts); United States v. Raymer, 941 F.2d 1031, 1037 (10th Cir. 1991)(reviewing a district court's Double Jeopardy analysis de novo for the district court's legal conclusions and applying the clearly erroneous standard for its factual findings).[7]

## II.    THE DOUBLE JEOPARDY CLAUSE DOES NOT APPLY, BECAUSE THE CONSPIRACIES ARE DIFFERENT.

The Court concludes that Leal's conspiracy-to-distribute-methamphetamine conviction is a different conspiracy than the one that the Superseding 3308 Indictment charges in Count I.  In June, 2016, Leal conspired with B. Tapia, and C. Tapia to distribute methamphetamine; in July 2016, Leal allegedly conspired with Carmona, and Arreola-Palma to distribute methamphetamine.  These conspiracies are distinct and do not overlap in time.  See Short v. United States, 91 F.2d 614, 620 (4th Cir. 1937)("[W]here a continuing offense such as conspiracy is charged as having been committed within a stated period, an acquittal or conviction will bar another prosecution for the same offense alleged as having been committed within a period which overlaps any part of the former period.").  Consequently, the Double Jeopardy Clause does not apply.

The traditional starting point for determining whether two charges are one and the same

_____

[7]That the Court can make a determination before trial does not mean, however, that the Court's determination will not change once it sees the actual evidence that the United States introduces.

for Double Jeopardy purposes is <u>Blockburger</u>.  Under the <u>Blockburger</u> test -- also known as the same evidence or same elements test -- when multiple charges relate to the same act or transaction, determining "whether there are two offenses or only one" depends on "whether each provision requires proof of a fact which the other does not." <u>Blockburger</u>, 284 U.S. at 304.  "A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." <u>Blockburger</u>, 284 U.S. at 304 (internal quotation marks omitted).

Courts have recognized that <u>Blockburger</u> is "of limited value" when it comes to successive conspiracy prosecutions, because, "[i]f the 'same evidence' test was the sole standard for determining whether multiple conspiracies exist, then prosecutors could carefully draw two indictments by choosing different sets of overt acts and make one conspiracy appear to be two." <u>United States v. MacDougall</u>, 790 F.2d 1135, 1144 (4th Cir. 1986)(citing <u>United States v. Thomas</u>, 759 F.2d 659, 662 (8th Cir. 1985); <u>United States v. Bendis</u>, 681 F.2d 561, 564-65 (9th Cir. 1981)).  <u>See</u> <u>United States v. Puckett</u>, 692 F.2d 663, 668 (10th Cir. 1982)("While we adhere to the same evidence test, we recognize that it has been criticized in recent years as an inadequate measurement of double jeopardy when applied to multiple prosecutions for conspiracy charges.").[8]  Faced with successive conspiracy counts, Courts of Appeals have applied various

_____

[8]In this case, using <u>Blockburger</u> as the sole standard would mean quickly concluding that the two conspiracies are different, merely because the United States crafted the indictments in a way which calls for different evidence relating to two different methamphetamine transactions. Whether the methamphetamine transactions are overt acts in furtherance of one conspiracy or two conspiracies in their own right is a question the Court must continue to probe.  <u>See</u> <u>Ex parte Nielsen</u>, 131 U.S. at 185 (concluding that two indictments covered the same timeframe, even though the United States charged that the crimes occurred on different dates).

tests, including a totality of the evidence test, see, e.g., United States v. Benefield, 874 F.2d 1503, 1506 (11th Cir. 1989); United States v. Liotard, 817 F.2d 1074, 1078 n.7 (3d Cir.1987), and factor tests, like the Korfant factors, see, e.g., United States v. Korfant, 771 F.2d 660, 662 (2d Cir. 1985).

The Tenth Circuit "adhere[s] to the same evidence test" while recognizing its deficiencies in its application to successive conspiracy charges. See United States v. Puckett, 692 F.2d at 668. The Tenth Circuit has stated that, in determining whether successive conspiracy counts are one in the same, the "focal point . . . is whether the alleged co-conspirators 'were united in a common unlawful goal or purpose'" United States v. Sasser, 974 F.2d 1544, 1550 (10th Cir. 1992)(quoting United States v. Daily, 921 F.2d 994, 1007 (10th Cir. 1990)). "'Of principal concern is whether the conduct of the alleged co-conspirators, however diverse and far-ranging, exhibits an interdependence.'" United States v. Sasser, 974 F.2d at 1550 (10th Cir. 1992) (quoting United States v. Daily, 921 F.2d at 1007)(citing United States v. Evans, 970 F.2d 663, 671 (10th Cir. 1992)). See States v. Ruiz, 16 F.3d 418 (10th Cir. 1993)(table)(stating that United States v. Sasser provides the "controlling analysis for defendant's double jeopardy claim" for successive conspiracy charges).

Applying these principles to this case's facts requires first classifying the conspiracies at issue. To prove a conspiracy, the United States must show: "(1) that two or more people agreed to violate the law[,] (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent." United States v. Small, 423 F.3d at 1182-83. Conspiracies can be complex, and complex conspiracies are usually structured as metaphorical chains or wagon wheels:

In a wagon wheel conspiracy, "a single person or group (the 'hub') deal[s] individually with two or more other persons or groups (the 'spokes')." Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 6.5, at 551 (2d ed. 1986). Separate spokes meeting at a common center constitute a wheel conspiracy only if those spokes are enclosed by a "rim." *Kotteakos v. United States,* 328 U.S. 750, 755 . . . (1946). In a chain conspiracy, "there is successive communication and cooperation in much the same way as with legitimate business operations between manufacturer and wholesaler, then wholesaler and retailer, and then retailer and consumer." LaFave & Scott, *supra,* at 551. This circuit has noted that "'[m]ost narcotics networks involve loosely knit vertically-integrated combinations.'" *United States v. Brewer,* 630 F.2d 795, 799 (10th Cir.1980)(citation omitted).

United States v. Evans, 970 F.2d 663, 668 (10th Cir. 1992).

Whether Leal's Double Jeopardy argument is meritorious depends on whether Leal was part of a single conspiracy to distribute methamphetamine that included Leal, B. Tapia, C. Tapia, Arreola-Palma, and Carmona. If Leal was part of only one conspiracy, then the Superseding 3308 Indictment violates the Double Jeopardy Clause, because Leal has already been convicted on a conspiracy charge. The Double Jeopardy Clause permits a second Leal conspiracy prosecution, however, if Leal was part of two distinct conspiracies to distribute methamphetamine, i.e., one conspiracy between Leal, B. Tapia, and C. Tapia ("the Tapia Deal"), and another conspiracy between Leal, Arreola-Palma, and Carmona ("the Carmona Deal").[9]

To begin, the Court concludes that there is no evidence that the members of the Tapia Deal and the Carmona Deal entered into a simple conspiracy with each other. Leal is the only

---

[9]A conspiracy between only Leal and the CI is not a sound option, because one cannot, as a matter of law, conspire with a person acting only as a confidential informant. See United States v. Dimeck, 24 F.3d 1239, 1242 n.6 (10th Cir. 1994)("Confidential informants and government agents cannot serve as the second party to a conspiracy."); United States v. Barboa, 777 F.2d 1420, 1422 (10th Cir. 1985)("[T]here is no real agreement when one 'conspires' to break the law only with government agents or informants. The elements of the offense are not satisfied unless one conspires with at least one true co-conspirator."). See also 18 U.S.C. § 371 ("If two or more persons conspire either to commit any offense against the United States, or to defraud the United States . . . each shall be fined under this title or imprisoned not more than five years, or both.").

common member of those deals.  The Tapia Deal and the Carmona Deal may, nonetheless, be part of one conspiracy if they are part of a chain or wagon wheel conspiracy.

The Tapia Deal and the Carmona Deal are not part of one chain conspiracy.  In a chain conspiracy, "'there is successive communication and cooperation in much the same way as with legitimate business operations between manufacturer and wholesaler, then wholesaler and retailer, and then retailer and consumer.'"  United States v. Evans, 970 F.2d at 668 (quoting Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* § 6.5, at 551 (2d ed. 1986)).  The Tapia Deal and the Carmona Deal did not involve successive communication or cooperation between the players resembling a legitimate business' supply chain; rather, the Tapia Deal and the Carmona Deal are discrete and parallel transactions where two different sets of people sold methamphetamine to the CI and the undercover ATF.

The Tapia Deal and the Carmona Deal are also not part of a single wagon wheel conspiracy.  An agreement with someone as the hub and others as spokes becomes a wagon wheel <u>conspiracy</u> only when all the "spokes are enclosed by a *rim*."[10]  United States v. Evans, 970 F.2d 663, 670-71 (10th Cir. 1992)(emphasis in original).  Rim enclosure means that the co-conspirators share a "single criminal objective, not just similar or parallel objectives between similarly situated people."  United States v. Evans, 970 F.2d at 670.  Thus, the co-conspirators must be interdependent in some way, such that "the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole," United States v. Horn, 946 F.2d 738, 740-41 (10th Cir. 1991), even if not all the co-conspirators transact with or even know each other, see United States v. Daily, 921 F.2d 994,

---

[10]To whatever extent the federal judiciary values fidelity to wagon-related nomenclature, the Court notes that a wagon wheel's outer ring is known as a "felloe" and not a "rim."  <u>Wagon Wheel Information</u>, at http://www.wagonwheeldirectory.com/wagon_wheel.html.

1007 (10th Cir. 1990)("[O]f principal concern is whether the activities of alleged co-conspirators in one aspect of the charged scheme were necessary or advantageous to the success of the activities of co-conspirators in another aspect of the charged scheme, or the success of the venture as a whole.").

Tapia Deal and the Carmona Deal are not part of one wagon wheel conspiracy, because they are not interdependent. Although they involve similarly situated individuals -- methamphetamine sellers and buyers --  pursuing similar objectives -- distribution of methamphetamine -- the evidence indicates that the success of one deal does not depend on the success of the other. Given that there is no interdependence between the Tapia Deal and the Carmona Deal, the Court concludes that the United States, in its Superseding 3308 Indictment, charges Leal with a different conspiracy than the one for which Leal was previously convicted.

## III.  EVEN IF THE SUPERSEDING 3308 INDICTMENT'S CONSPIRACY CHARGE VIOLATED THE DOUBLE JEOPARDY CLAUSE, THE COURT WOULD NOT DISMISS THE OTHER CHARGES AGAINST LEAL.

Leal argues that, if the Court dismisses the conspiracy charge, the Court should also dismiss the Superseding 3308 Indictment's other charges without prejudice, so that the United States can make a "fresh presentation of those charges to a new grand jury" that excludes the proof supporting the conspiracy charge. Motion at 3. Leal does not articulate a particular legal theory why a Grand Jury would need a fresh presentation, and the Court cannot come up with a sound one on its own. Generally speaking, the United States enjoys considerable freedom regarding the evidence it can present to a Grand Jury, and courts will generally "not sustain a defendant's challenge to a facially valid indictment on grounds of insufficient evidence, hearsay, incompetent evidence, or illegally obtained evidence." Indictments, 91 Geo. L.J. 236, 245-46 (2003)(citations omitted). "An indictment returned by a legally constituted and unbiased grand

jury, . . . if valid on its face, is enough to call for trial of the charge on the merits." Costello v.
United States, 350 U.S. 359, 363 (1956)(holding that there is no Fifth Amendment right to
challenge the sufficiency of evidence presented to a Grand Jury).

Moreover, it is not clear what a fresh presentation of the Superseding 3308 Indictment's
non-conspiracy counts would accomplish. The Superseding 3308 Indictment charges Leal with
being a part of a conspiracy to distribute methamphetamine between July 21, 2016 and August 3,
2016, and with distributing methamphetamine on July 24, 2016 and again on August 3, 2016.
See Superseding 3308 Indictment at 1-2. The Court imagines that a fresh presentation to a
Grand Jury of only the methamphetamine distribution charges would not look much different,
because any evidence needed to show probable cause for conspiracy to distribute
methamphetamine would presumably also be needed to show probable cause for the conspiracy's
overt acts.

**IT IS ORDERED** that Defendant Gaspar Leal's Motion to Dismiss Count
1 -- Conspiracy for Violation of Double Jeopardy Clause, filed March 6, 2018 (Doc. 119), is
denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
   United States Attorney
Norman Cairns
Samuel A. Hurtado
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

   *Attorneys for the Plaintiff*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

*Attorney for the Defendant*